IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

V.                                                              NO. 4:19-CR-29

CORNELIUS K. HARRIS

## ORDER

This criminal case is before the Court on Cornelius Harris' motion to suppress.  Doc. #38.

## I
## Procedural History

On February 28, 2019, Cornelius Harris was charged in a one-count indictment with being

a felon in possession of a firearm.  Doc. #1.  On June 20, 2019, the government filed a superseding

indictment which charges the same substantive count but slightly alters the charging language.

Doc. #17.

On January 6, 2020, Cornelius[1] filed a motion to suppress evidence and statements obtained

during an April 27, 2017, investigative stop, from which the pending charges against him arise.

Doc. #38.  The government responded in opposition to the motion on January 16, 2020.  Doc. #39.

Cornelius did not reply.  An evidentiary hearing on the motion was held February 26, 2020.  Doc.

#52.  At the conclusion of the hearing, the Court took the motion to suppress under advisement.

## II
## Factual Background[2]

Strange Park in Greenville, Mississippi, is located between two of Greenville's larger

---

[1] The facts of the case involve Cornelius Harris and his brother Johnny Harris.  To avoid confusion, the Court refers to them by their first names.

[2] In conducting a suppression hearing, a court is not bound by the Federal Rules of Evidence.  Fed. R. Evid. 104(a); *see United States v. Posado*, 57 F.3d 428, 435 (5th Cir. 1995) ("We have consistently held that the rules of evidence are relaxed in pretrial suppression hearings.").

streets—Orlando and Washington. There is a "large square area" with a basketball court and a parking area in the park's northeast corner. The park is bisected by an "alley street," and sits in a neighborhood with pedestrian and vehicular traffic.

At approximately 8:00 p.m. on April 27, 2017, LeShaun McWright, a patrolman with the Greenville Police Department, received a call to respond to a shots-fired call in the area of Strange Park. McWright responded with officers Dylan Magnum and Adriane Smith. The officers were informed that the suspects were near the basketball court and that a truck was involved. According to McWright and Magnum, the dispatcher did not provide the color of the truck. However, Smith recalled the dispatcher noted that "it was going to be a white truck."

The three officers arrived to the park in separate vehicles, with McWright and Smith arriving approximately three or four minutes after receiving the call, and Magnum arriving sometime later. McWright approached the basketball court from the west on the alley street. When he arrived at the basketball court, McWright observed two African American men standing on the basketball court and approximately ten people standing about a hundred yards away from the court. McWright also saw a pickup truck in the parking lot near the basketball court.

McWright exited his vehicle and called over to the two men on the basketball court. The two men, who were both wearing dark clothing[3] and blue baseball caps, came over and McWright asked to see their hands. The men complied and identified themselves as Johnny Harris and Cornelius Harris. McWright had a "slight" and "calm" conversation with them, during which he asked for their names and other information. After speaking with the men for "five minutes or so," McWright allowed them to get in their vehicle, a blue pickup truck, to leave because nothing about them raised a "red flag."

---

[3] Cornelius was wearing blue jeans, a white t-shirt, and a camouflage jacket.

While McWright was interacting with Cornelius and Johnny, Smith was investigating a white Ford Explorer she observed while approaching the park. Smith conducted a field interview with the occupants of the truck to determine whether they were involved in the shooting. Smith ultimately determined that the occupants of the Explorer were not involved in the shooting and allowed them to leave. Smith released the Explorer's occupants as McWright was allowing Cornelius and Johnny to depart in their truck. At this time, dispatch issued a new report that the two suspects in the shooting were in blue "Kansas caps." Based on this new information, McWright stopped the truck with Cornelius and Johnny, which had not moved more than "a foot or so." Smith went to assist.

After stopping the truck, McWright approached the driver's side and asked the driver, Johnny, to exit the vehicle. Johnny exited the vehicle and McWright conducted a brief pat down to ensure that no weapons were on Johnny's person. McWright found no weapons on Johnny.

At approximately the same time, Smith went to the passenger side of the vehicle, where Cornelius was sitting, and observed "a big bag of marijuana" in plain view on the dashboard. Smith started a "small conversation" with Cornelius, to "take his mind off what was going on." During the conversation, Cornelius admitted the marijuana was his. After this admission, Smith asked Cornelius to step out of the vehicle and, when he did, she placed handcuffs on him. At some point during the interaction, Magnum asked for consent to search the vehicle. According to Magnum, both Cornelius and Johnny gave consent.

Once Cornelius was handcuffed, Magnum, who had been observing Smith and Cornelius' interaction, performed a pat down of Cornelius to ensure that Cornelius was not carrying a weapon which would pose a danger to the officers. The pat down revealed a .380 caliber pistol hidden in the crotch of Cornelius' pants. Cornelius was arrested as a suspect for the crime of discharging a

3

firearm and for carrying a concealed weapon.  The indictments in this case followed.

## III
## Analysis

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  What is known as the exclusionary rule "was created by the Supreme Court to supplement the bare text of the Fourth Amendment ." *United States v. Ganzer*, 922 F.3d 579, 584 (5th Cir. 2019) (internal quotation marks omitted).  The rule "operates by generally barring the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Id.* (cleaned up).  "The exclusionary rule reaches not only the evidence uncovered as a direct result of the violation, but also evidence indirectly derived from it—so-called 'fruit of the poisonous tree.'" *United States v. Mendez*, 885 F.3d 899, 909 (5th Cir. 2018).

"The party seeking suppression has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his Fourth Amendment rights." *United States v. Beverly*, 943 F.3d 225, 231 (5th Cir. 2019) (internal quotation marks omitted). "That burden includes establishing standing to contest the evidence, and showing that the challenged government conduct constitutes a Fourth Amendment search or seizure." *United States v. Turner*, 839 F.3d 429, 432 (5th Cir. 2016) (citation omitted).  If the defendant establishes a search or seizure occurred without a warrant, "the government bears the burden of proving, by a preponderance of the evidence, that the search and seizure were constitutional." *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012).

Cornelius' motion to suppress raises two arguments:  (1) "[t]here was no reasonable suspicion or probable cause to stop or search Cornelius Harris;" and (2) "[e]ven if there was reasonable suspicion … the search of his person exceeded the consent to search the truck."  Doc.

#38 at 3–4. At the hearing, Cornelius seemed to drop his challenge to the pat down and focus on the alleged impropriety of McWright's initial contact with him and Johnny. During closing arguments, Cornelius argued that because McWright lacked reasonable suspicion to speak with him, "[a]nything found after the blue truck … is fruit of the poisonous tree." Cornelius' argument appears to rest on the assumption that there was only one seizure in this case, which began when McWright called him and Johnny over and continued through the stop of the truck. This does not appear to be the case.

### A. Seizure at Issue

"Under the Fourth Amendment, a seizure occurs when, under the totality of the circumstances, a reasonable person would have thought he was not free to leave." *Keller v. Fleming*, 952 F.3d 216, 222 (5th Cir. 2020). Under this standard, "mere police questioning does not constitute a seizure." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Rather, to determine whether a seizure occurred, a court may consider the following non-exclusive factors: "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled." *Carney v. Brandon Police Dep't*, 624 F. App'x 199, 202 (5th Cir. 2015) (citing *United States v. Mask*, 330 F.3d 330, 337 (5th Cir. 2003)). A seizure, once instituted, lasts only so long as a reasonable person would not have felt free to leave. *United States v. Williams*, 784 F. App'x 876, 881 (5th Cir. 2019) (collecting cases).

Here, McWright was alone during what he described as a "calm" interaction with the Harrises. And there is no evidence McWright displayed a weapon, touched either of the men, or used language or a tone of voice that suggested compliance with his requests would be compelled. Under these circumstances, the Court concludes that Cornelius has failed to meet his burden of

showing a seizure with respect to the initial interaction with McWright.[4]

However, there is no question that Cornelius was seized when McWright stopped the truck as it was driving away. *United States v. Smith*, 952 F.3d 642, 647 (5th Cir. 2020) ("A Fourth Amendment 'seizure' occurs when an officer stops a vehicle and detains its occupants."). To the extent this traffic stop[5] led to the discovery of the gun and Cornelius' subsequent arrest, the question becomes whether the stop complied with the Fourth Amendment.

### B. Legality of Traffic Stop

To determine whether a traffic stop complied with the Fourth Amendment, a court must ask two questions. *Id.* First, the court asks "whether the stop was justified at its inception." *Id.* "Second, if the stop was justified, [the court asks] whether the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the vehicle in the first place." *Id.* (internal quotation marks omitted).

### 1. Justification

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity … occurred, or is about to occur, before stopping the vehicle." *Id.* "Reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* at 647–48. "The standard takes into account the totality of the circumstances—the whole picture." *Navarette v. California*, 572 U.S. 393, 397 (2014) (internal quotation marks omitted).

---

[4] Even if the interaction rose to the level of a seizure, the seizure indisputably ended when McWright allowed the Harrises to leave.

[5] Traffic stops "generally entail law enforcement officers signaling a moving automobile to pull over to the side of the roadway." *Delaware v. Prouse*, 440 U.S. 648, 657 (1979). However, a traffic stop also occurs when an officer stops a moving vehicle in a parking lot. *See United States v. Gardner*, 444 F. App'x 361, 362–63 (11th Cir. 2011).

The government contends the officers had reasonable suspicion to stop the truck because dispatch stated the suspects were in a truck and wearing blue baseball hats and because Cornelius was near a truck wearing a blue baseball hat. Doc. #39 at 6. Cornelius argues the officers lacked reasonable suspicion because dispatch stated that the truck was white, when the Harrises' truck was blue. Doc. #38 at 3–4.

As an initial matter, the Court notes that the record is far from clear that dispatch identified the color of the relevant truck as white. Two of the three testifying witnesses did not recall any such identification. Regardless, "some discrepancy between a description provided by dispatch and the officer's observation does not eliminate reasonable suspicion." *United States v. Reed*, No. 116-50, 2017 WL 3084156, at *11 (S.D. Ga. June 28, 2017). Rather, a court should consider whether, accounting for the discrepancies, the totality of the circumstances gave rise to reasonable suspicion. *United States v. Atkins*, 513 F. App'x 577, 580 (6th Cir. 2013) (citation omitted); *United States v. Davis*, 175 F. App'x 286, 288 (11th Cir. 2006); *United States v. Ayala*, 60 F.3d 835 (9th Cir. 1995) (table decision). In considering reasonable suspicion following a shooting, the Fifth Circuit has focused on the extent to which the suspect matched a description, and "the amount of time between learning of the shootings and responding, coupled with the proximity between the stop and where the shootings occurred." *United States v. Bolden*, 508 F.3d 204, 206 (5th Cir. 2007).

As mentioned above, dispatch reported a shooting involving a truck and that multiple suspects were in the area of the basketball court. Within four minutes of receiving the call, McWright observed two men, both wearing blue baseball caps, standing on the basketball court with a truck nearby. A subsequent dispatch identified the suspects as wearing blue baseball caps. The circumstances here supporting a finding of reasonable suspicion of involvement in the

7

shooting (the existence of a truck, the location of the truck and the Harrises at the scene of the shooting within minutes of the report, and the fact the Harrises wore matching clothing identified by dispatch) far outweigh the discrepancy in color of the truck, if one existed. Accordingly, the Court concludes that McWright had reasonable suspicion to justify the stop of the truck based on the Harrises' suspected involvement in the discharging of firearms.

## 2. *Scope*

"In the context of a traffic stop, once an officer's initial suspicions have been verified or dispelled, the detention must end unless there is additional reasonable suspicion supported by articulable facts." *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013). In addition to this requirement, the court must "evaluate whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." *Id.* "To justify a patdown of the driver or a passenger during a traffic stop, … the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009).

There can be no dispute that the stop did not extend beyond the time reasonable suspicion was dispelled. Indeed, it does not appear the suspicion was ever dispelled. Furthermore, officers responding to a shots-fired call are entitled to perform a pat down of a person reasonably suspected to have discharged the firearm. *See United States v. Harris*, 182 F. App'x 528, 529 (7th Cir. 2006) ("Officer Trincado had reasonable suspicion to conduct the pat-down search of Harris. Harris generally matched the description of the suspect, supporting Trincado's fear that he might be armed because the suspect reportedly discharged a gun in the same location."); *United States v. Rosser-Stewart*, No. 19-cr-10104, 2019 WL 6911970, at *3 (D. Mass. Dec. 19, 2019) ("During an investigatory stop, officers may conduct a limited pat-frisk of a person's outer clothing for weapons for the officers' safety and the safety of others. This was warranted here, given that there

had been shots fired and the weapons had not yet been recovered.") (citation omitted); *United States v. Thornton*, No. 5:13-cr-522, 2014 WL 11173589, at \*4 (N.D. Ohio Apr. 17, 2014) ("[T]he officers had reasonable belief that Defendant had just committed a crime: discharging a gun. It would be reasonable to suspect that Defendant may be armed and dangerous."). For the reasons above, the Court concludes that the officers reasonably suspected that Cornelius had committed the crime of discharging a firearm. Accordingly, the scope of the stop, including the pat down, was proper.

### C.  Summary

In sum, the officers had reasonable suspicion to believe that Cornelius discharged a firearm. This reasonable suspicion justified both the stop of the vehicle and the pat down which ultimately led to Cornelius' arrest.[6]

### IV
### Conclusion

Harris' motion to suppress [38] is **DENIED**.

**SO ORDERED**, this 1st day of May, 2020.

/s/Debra M. Brown
**UNITED STATES DISTRICT JUDGE**

---

[6] Having reached this conclusion, the Court declines to consider the government's alternative argument that the evidence would be admissible under the inevitable discovery doctrine.